OPINION
Defendants-appellants Lester and Shauna Scott appeal to this court after guilty verdicts were rendered against them in the Mahoning County Common Pleas Court. Central to our disposition of said appeal, we are called upon generally to determine the parameters of a search warrant, and specifically to ascertain: (1) whether a warrant authorizing a search for a 9mm auto-pistol includes the right to open containers which could not contain the weapon, but might conceivably hold a part thereof; and, if not, (2) whether language in a search warrant purportedly authorizing a search "for other instruments of fruits of the crimes" gives the police that right. As we answer both questions in the negative for the reasons hereinafter set forth, the trial court's decision on suppression is reversed. Accordingly, this cause is remanded for suppression of certain evidence obtained in violation of appellants' rights.
 STATEMENT OF FACTS
Lester and Shauna Scott lived in a triplex apartment building on Elm Street in Youngstown, Ohio. Also living in this building was their son. Various pieces of evidence led police to conclude that the son committed a robbery/shooting, attempted murder and murder. For instance, 9mm shell casings found at each of the three crime scenes matched shell casings which an informant brought to police after watching the son shoot his 9mm handgun which ejected the casings into a field. Also, prior to his death, the murder victim confessed that he and the son committed the robbery/shooting.
Thus, a search warrant was issued to search the entire apartment building and the son's vehicle for "a 9mm auto-pistol and other instruments of [sic?] fruits of these crimes, all of which is evidence of [murder, attempted murder and robbery]." On July 11, 1997, police arrested the son while he was in his vehicle, and a 9mm handgun was recovered. Approximately twenty minutes later, police entered and searched the Scott's residence. During this search, police discovered four grams of cocaine in a box for a video tape. They found approximately $17,000 in currency and $1,500 in food stamps in a bag. Some ammunition was also confiscated.
On February 13, 1998, Lester Scott was indicted for fifth degree felony possession of cocaine in violation of R.C. 2925.11 (A)(C)(4)(a), fourth degree felony illegal use of food stamps in violation of R.C. 2913.46(B)(D) and fifth degree felony possession of criminal tools in violation of R.C. 2923.24(A)(3)(C). He was arrested on February 18, 1998 and released on bond. A motion to suppress was filed on March 16, 1998. The suppression hearing began on September 10, 1998 and resumed on October 2, 1998.
In the meantime, on September 17, 1998, a superseding indictment was filed in order to add Shauna Scott as a defendant in the three crimes for which Lester Scott was previously indicted. This superseding indictment also charged Shauna Scott with third degree felony perjury in violation of R.C. 2921.11(A) as a result of her testimony in a forfeiture hearing.
After post-hearing suppression briefs were submitted, the parties agreed that the court's decision on suppression would apply to both defendants. On March 9, 1999, the court denied the suppression motion.
On April 28, 1999, immediately prior to the scheduled trial, appellants filed a motion to dismiss on various grounds. The first basis for dismissal set forth in the motion alleged that Lester Scott's speedy trial rights had been violated. Subsequently, after various continuances and hearings, the court denied this motion. A jury trial began on October 4, 1999.
The jury found Lester Scott not guilty of possession of criminal tools but guilty of possession of cocaine and illegal use of food stamps. The court sentenced him to twelve months on the food stamps conviction and eighteen months on the cocaine conviction to run concurrently.
The jury found Shauna Scott not guilty of possession of cocaine and not guilty of possession of criminal tools but guilty of illegal use of food stamps and perjury. The court sentenced her to ten days in jail, fined her $1,000 and imposed four years of community control. Appellants filed timely notice of appeal.
 ASSIGNMENT OF ERROR NUMBER ONE
Appellants' first assignment of error provides:
 "IT WAS ERROR FOR THE TRIAL COURT TO OVERRULE DEFENDANTS' MOTION TO SUPPRESS THE EVIDENCE OBTAINED IN VIOLATION OF DEFENDANTS' RIGHTS UNDER R.C. 2933, THE OHIO CONSTITUTION AND U.S. CONSTITUTION."
Before delving into the crux of this assignment, we shall respond to the state's preliminary argument. The state urges this court to disregard this assignment of error because appellants failed to submit the trial transcript to this court. The state contends that this court requires the trial transcript to confirm appellants' argument that the unsuppressed evidence was admitted at trial.
However, because a decision on suppression occurs pretrial, it is illogical to absolutely require transcripts from the trial to be prepared and submitted to the appellate court. Appellants submitted the suppression transcripts to this court; it is the motion to suppress and the suppression transcripts that govern our decision. When an appellate court evaluates a suppression issue, the court is not technically faced with affirming or reversing a conviction, but rather the court is faced with affirming or reversing the decision on suppression. The reversal and remand of a trial court's denial of a suppression motion may or may not require dismissal of the charges.
We agree that trial transcripts could be reviewed for harmless error if ordered by the state to establish harmless error or if ordered by the defendant in support of other assignments of error. Nevertheless, we do not believe that a trial transcript is a mandatory filing or a condition precedent to a defendant raising a suppression issue on appeal. See,e.g., App.R. 9(B) (requiring only the necessary portions of the transcript to be filed and providing the appellee with a method to compel the appellant to submit necessary portions that were omitted); State v.Henderson (1990), 51 Ohio St.3d 54, 58, fn. 2 (mentioning that only a suppression transcript was submitted without holding that the defendant had the duty to submit a trial transcript). As such, in reviewing this assignment of error, only the suppression transcripts were necessary.
The key question in such cases is not whether a trial transcript is part of the record. Rather, the key question is whether or not there is sufficient information in the record to determine that the evidence which was the object of a suppression motion addressed an essential element of the crime charged. If it did not, then it would be very difficult for a reviewing court to conclude that a trial court committed prejudicial error in failing to sustain a motion to suppress. However, where it can be determined that the evidence sought to be suppressed constitutes an element of the crime convicted, prejudice to appellants is apparent.
Here, even the dissent concedes that it is apparent that all convictions in the case at bar originate out of the search of the Scott residence and the seizure of evidence such as cocaine and food stamps. See State v. Cowans (1999), 87 Ohio St.3d 68, 80 (stating that the admission of an erroneously unsuppressed item constituting the critical element of the crime is not harmless). Accordingly, we conclude that the lack of a trial transcript is not a fatal defect and we shall now address the merits of this assignment of error dealing with suppression issues.
In reviewing suppression issues, this court defers to the trial court's factual findings but conducts a de novo review regarding the law and the proper application of the law to the facts. See, e.g., State v.Brandenstein (Dec. 30, 1999), Belmont App. No. 98BA30, unreported, 3.
The first suppression issue is whether the police had a right to search the Scott residence. In support of their position, appellants note that once police discover the item specified in the search warrant, the search must terminate. Accordingly, appellants claim that once the police arrested their son and recovered a 9mm from his possession, they were not permitted to enter the house. Conversely, the state contends that the officers were unable to determine if the 9mm handgun recovered from the suspect was the murder weapon and that such a determination would have to be made after laboratory testing.
We note that in Horton v. California (1990), 496 U.S. 128, the court stated that police with a search warrant for a rifle must terminate the search once the rifle is found. Id. at 141 (Although Horton may not be a case on point as the issue appealed was whether plain view discovery must be inadvertent, it nevertheless set forth the general law behind search and seizure cases involving items found that are not specifically enumerated in the warrant). In the case at bar, the search warrant authorized a search of the suspect's vehicle and residence for a 9mm auto-pistol. The affidavit in support of the warrant recited an informant's tip as part of the probable cause. Specifically, the affidavit read, "The aforementioned confidential informant also advised affiant that [suspect] still has the weapon used in these crimes, and that he always carries the gun with him." Appellants contend that if the confidential informant was so trustworthy that a warrant was issued in reliance on his statements, observations and evidence collecting skills, then once police discovered a 9mm auto-pistol on the suspect, it is not unreasonable for them to assume that they possessed the object of the search.
Yet, as the state points out, the officers were unaware of the brand name and serial number of the gun. Additionally, it does not appear unreasonable for officers to conclude that a person who allegedly shot three different people on three different occasions with a 9mm handgun may own more of these guns. Accordingly, the decision to proceed with the residential search under these facts and circumstances was not improper. Nonetheless, even if it were reasonable for officers to assume that they did not possess the object of their search and to proceed with the residential search to preserve the murder weapon in case they had the wrong 9mm auto-pistol, the scope of the search is problematic.
During the search, police discovered items which allegedly incriminated the Scotts, rather than the actual subject of the search warrant. The state claims that a warrant authorizing a search for a gun and instruments of murder or robbery necessarily allows police to search for ammunition and parts of a gun. The state also relies on the plain view doctrine to uphold the validity of the discovery and seizure of this evidence.
To rely on the plain view doctrine, not only must the police have been lawfully located at the place of the search when they notice an object whose incriminating character is immediately apparent, but police must have had a lawful right of access to the object itself. Horton,496 U.S. at 136-137. In gaining lawful right of access to an object which is in a container, the container must logically be capable of concealing the specific object of the search. State v. Welch (1985), 18 Ohio St.3d 88,92, citing United States v. Ross (1982), 456 U.S. 798, 821 (which states, "a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found." [Emphasis added]). See, also, Wyoming v. Houghton (1999), 526 U.S. 295, 307. As such, the next issue concerns whether the police were entitled to open certain containers during their search.
Appellants claim that the scope of the search was too broad as police looked in places where a 9mm auto-pistol could not be found. For instance, Officer Wilson testified that he opened a box for a video tape and discovered crack and powdered cocaine. He admitted that the box was too light to have contained a gun but claimed that the box could have contained ammunition or the component parts of a gun. (9/10/98 Supp. Tr. 28, 36). This officer also found a large plastic shopping bag in a closet. When asked if it could contain a gun, he stated, "I don't know. It felt heavy." Id. at 25. When he opened the bag, he spotted green leafy matter that appeared to be marijuana and approximately $17,000 in cash. (Laboratory testing later revealed that the leaves were not marijuana.) In this large plastic bag was a smaller bag which was not transparent and which the officer admitted could not contain a 9mm handgun. Id. at 26. Upon opening this bag, the officer discovered $1,500 worth of food stamps.
Since the officer admitted that neither the video box nor the bag of food stamps could have contained a 9mm handgun, appellants urge that the cocaine found in a video box and the food stamps found in a bag should be suppressed. Contrary to the dissent filed to this opinion which cites an unreported appellate case out of Arkansas, neither appellant nor this court suggests that a 9mm auto-pistol cannot fit into a video box or into the bag containing food stamps. Rather, the focus is on the officer's admission that he knew a firearm did not rest in either of these containers. It is not only the size of the container, but also the density and weight of the container that is at issue herein. See Statev. Bulls (June 28, 2000), Mahoning App. No. 98CA173, unreported (although a plain feel/frisk case, we stated that the fact that a pouch is large enough to contain a weapon does not per se provide a reasonable belief that a weapon is contained therein), citing State v. Evans (1992),67 Ohio St.3d 405, 416. See, also, State v. McDonald (Oct. 24, 1997), Lucas App. No. L-97-1037, unreported, 2 (noting the importance of the weight of an eyeglass case in determining whether it was logical to believe the case contained a firearm). For example, where a search warrant authorizes the search for and seizure of a twenty-seven pound standard gold bar, police cannot open a feather-light bag solely because a gold bar could fit in the bag. (Nor, as we will discuss infra, could police open the bag only the basis that a sliver of a gold bar could possibly be contained therein.)
The dissent opines that the officer's subjective intent is irrelevant. However, the holdings on the irrelevancy of subjective intent deal with scenarios where probable cause exists to search for one object and the officer lawfully finds in plain view an object which he was subjectively hoping he would find. Horton, 496 U.S. at 138, 141 (stating that as long as the officer stays within the scope of the warrant, the fact that he finds an item not specified in the warrant does not invalidate the seizure just because he was fairly certain that the unspecified item would be found). As the dissent suggests, the cases mandate an objective assessment of alleged Fourth Amendment violations. However, that objective assessment entails an evaluation of the "officer's actions inlight of the facts and circumstances then known to him" and requires consideration of the "facts available to the officer at the moment of theseizure of the search." Scott v. United States (1978), 436 U.S. 128, 137
(emphasis added). Hence, testimony that the officer subjectively hoped to find cocaine while lawfully searching for a weapon is not relevant; however, testimony that he opened a video box and a bag knowing that neither one contained a firearm is highly relevant to an objective assessment of the situation.
As aforementioned, the state contends that the scope of the search was not overbroad because police were searching for bullets and parts of a gun as well as the gun itself. First, we note that Officer Wilson, the officer who found the disputed items, did not read the search warrant. Further, the routine briefing before the execution of a warrant was not conducted. Officer Wilson testified that he knew that someone had been shot and robbed. He stated that he was searching for weapons but was never informed what type of weapon was sought.
We also point out that a drug trafficking investigator assisted in the execution of the search warrant solely because he had been investigating appellants for ten years even though the search warrant was the result of an investigation of the son's violent crimes. Appellants argue that police were using the son's crime as an opportunity to raid them. Nevertheless, alternative subjective reasons for a search warrant do not invalidate a warrant that is supported by probable cause. Returning to the issue, we note that this officer testified that he was searching for a 9mm handgun and its associated parts and ammunition.
Various constitutional and legislative provisions prohibit general exploratory searches. Pursuant to the Fourth Amendment of the United States Constitution, Article I Section 14 of the Ohio Constitution, R.C.2933.24(A) and Crim.R. 41(C), search warrants must "particularly" describe the property to be searched for and seized. The requisite specificity varies with the nature of the items to be seized. State v.Benner (1988), 40 Ohio St.3d 301, 307. Where the items are evidence or instrumentalities of a crime, the key inquiry is whether the warrants could reasonably have described the items more precisely. Id. In Benner, the Supreme Court upheld the language calling for seizure of "fibers and hairs and other trace evidence" by noting that it would be too difficult to list every possible source of hair and fiber and that the language sufficiently limited police to searching for and seizing only that evidence that could contain this type of evidence. Id.
In the case before us, the search warrant authorized a search for "a 9mm auto-pistol and other instruments of [sic?] fruits of these crimes, all of which is evidence of [murder, attempted murder and robbery]." The search warrant did not seek ammunition and did not indicate that officers were to search for the component parts of a 9mm auto-pistol. There is no indication in the affidavit that the attesting detective desired ammunition as he already possessed spent 9mm shell casings from each of the three crime scenes and spent 9mm casings that an informant picked up after the suspect shot his 9mm handgun in a field.
Furthermore, in cases where a search for ammunition or the parts of a gun were upheld, the warrant had specifically listed these items. See,e.g., State v. Jordan (Apr. 29, 1999), Cuyahoga App. No. 73453, to be reported, 13 (where the search warrant specified a 9mm or any other handgun and ammunition); State v. Van Johnson (Feb. 1, 1990), Montgomery App. No. 11347, unreported, 5 (where the search warrant authorized a search for firearms, ammunition and parts of firearms, and where an officer's affidavit articulated probable cause to believe that parts of firearms would be discovered that assisted the suspects in converting semiautomatic weapons into automatic weapons). In other cases, the seizure of ammunition, shell casings or gun parts was upheld after it was discovered in plain view in a place which could have concealed the specifically identified object of the search. See, e.g., State v.Williams (1978), 55 Ohio St.2d 82, 84 (stating that fruits or instrumentalities of a crime, such as a bullet, may be seized without being specifically named in a warrant if they are found in plain view; however, police cannot "rummage" through personal belongings to find unidentified incriminating evidence); State v. Fields (1971),29 Ohio App.2d 154, 161 (stating that where the warrant authorized a search for a .38 special, police could seize a shell casing from a .38 special if the casing was discovered in a place or container in which the .38 special itself could be found).
Under the Benner analysis, the nature of ammunition and parts of a gun are not types of evidence that are too difficult to describe more precisely than by solely listing a 9mm auto-pistol and other fruits or instrumentalities of murder and robbery. As Officer Wilson testified, a pistol could be broken down into parts such as a barrel, shaft, stock, trigger and springs. Furthermore, as the court noted in Van Johnson, a firing pin could be considered a component part of a firearm. If police could search for bullets and parts of a gun every time a warrant authorized a search for a firearm, then police searching for a firearm would have no limit to where they could search.
Analogously, according to the state's theory, if a warrant authorized the search of a garage for a stolen van, then police could open a latched toolbox and justify this search by stating that a VIN plate, or other component part of a motor vehicle, could have fit inside the toolbox. This is clearly not the law under search and seizure cases. See State v.Halczyszak (1986), 25 Ohio St.3d 301, 310 (affirming the seizure of a VIN plate spotted lying in an open tool box during the execution of a search warrant for a stolen vehicle but remanding for a determination on whether other tool boxes were open or closed with regards to the seizure of other evidence). As aforementioned, the United States Supreme Court stated that when a search warrant instructs police to search for illegal weapons, then police can open containers in which the weapon might be found.Ross, 456 U.S. at 821. The Court did not state that police can open containers in which the weapon, its bullets or its component parts might be found.
The point of the particularity of warrant requirements is that it is a court's function to make a probable cause decision concerning the objects of the search, leaving nothing in terms of the scope of the search to the discretion of the executing officers. Andresen v. Maryland (1976),427 U.S. 463, 480. Fruits and instrumentalities language is often inserted into search warrants even though police may seize fruits and instrumentalities discovered during a lawful search without corresponding language in the warrant. See Williams, 55 Ohio St.3d at 84. The Court inAndresen may have refused to invalidate a warrant based on fruits and instrumentalities language; however, it did not imply that police had discretion to determine the scope of the search, nor did it indicate that police had authority to search receptacles or crevices which could not hold the specified items. The Andresen Court held that the general fruits and instrumentalities phrase did not invalidate the entire warrant. Rather, the Court construed the fruits and instrumentalities language to be limited by the documents, relating to false pretenses by the defendant in selling a parcel of property, which were particularly itemized in the warrant. The Court then concluded that the officers were justified in seizing unnamed documents, found during the search for named documents, if those documents related to the crime of false pretenses regarding the sale of realty. In the case at bar, the officers attempted to utilize their own discretion to determine the scope of the search by opening containers that could not contain a 9mm auto-pistol on the basis that the containers could have contained a bullet or a piece of a 9mm, neither of which were specified in the affidavit or the warrant.
Contrary to the suggestions of the dissent, unspent ammunition is not a fruit or an instrumentality of a completed shooting. It is true that aspent bullet casing may be the instrumentality of shooting since it represents the means by which an end was achieved, i.e. a shooting is achieved through the expenditure of a bullet. See, e.g., State v. Fields
(1971), 29 Ohio App.3d 154 (defining instrumentality as an object that facilitates the commission of the crime, noting that a shell casing is an instrumentality of a crime where the weapon is a revolver which does not eject its casings, and stating that the integral part of the instrumentality test deals with seizure of evidence, not the search for evidence). However, a 9mm auto-pistol ejects its spent casings, and in this case, the casings were found at the crime scenes. As such, any spent shell casings in the house would not appear to be instrumentalities of the shooting being investigated. Again, if they were, they should have been included in the search warrant.
As an aside, we also disagree with the dissent's per se
characterization of a magazine as an integral part of a 9mm auto-pistol; in fact, such weapon can fire a bullet from the chamber without a magazine. Moreover, although a magazine may be an instrumentality of a shooting, it is a part of a gun just like any other part of a gun. Nonetheless, the dissent does not address the problem of where this court would draw the line, with gun parts, if we were to hold that police may search for a magazine when searching for a 9mm auto-pistol or the instrumentalities of a shooting. If we were to adopt the holding of the dissent, then police would be granted the discretion, after the issuance of the warrant, to brainstorm about the smallest item that could be a fruit or instrumentality of a shooting, such as a firing pin or a tissue with blood on it, and tailor their search of containers and spaces accordingly.
In conclusion, the search went beyond the scope of the warrant. The state cannot rely on the plain view doctrine as to the cocaine and food stamps because police did not have lawful right of access to these items when viewed within non-transparent containers which the officer knew could not contain the object of the search. If bullets and parts of firearms are to be included as objects of the search, they must be enumerated in the search warrant after the court finds that an affidavit supported by probable cause seeks these items.
For the foregoing reasons, the decision of the trial court refusing to suppress the cocaine and food stamps is reversed, and this cause is remanded for suppression of this evidence. Due to our resolution herein and/or the fact that trial transcripts were not filed, we need not address appellants' assignments of error dealing with the issues of admission of other acts evidence, refusal to dismiss the perjury charge, sufficiency of the evidence, and incorrect jury instructions. However, because a speedy trial violation absolutely requires dismissal of the case, we shall address appellants' fifth assignment of error.
 ASSIGNMENT OF ERROR NUMBER FIVE
Appellants' fifth and final assignment of error provides:
 "DEFENDANTS' SPEEDY TRIAL RIGHTS WERE VIOLATED BY THE TRIAL COURT."
The arguments under this assignment consist of a mere three sentences. The first sentence cites Section 10, Article I of the Ohio Constitution which accords an accused the right to a speedy trial. The second sentence quotes R.C. 2945.71 which provides that a person charged with a felony shall be brought to trial within two hundred seventy days after his arrest. The third and final sentence concludes that a review of the record demonstrates that the state failed to bring both Lester and Shauna Scott to trial within the applicable time frame.
Although the motion to dismiss and supplemental motion filed in the trial court list both Lester and Shauna Scott as the defendants who seek dismissal of the case, the reasons for dismissal were many, some involving both defendants and some involving one or the other. The supplemental memorandum contains an attached brief which details the reasons behind the alleged speedy trial violation. In this brief, however, only Lester Scott's speedy trial rights were alleged to be violated.
A defendant must raise an alleged violation of speedy trial rights "at or prior to commencement of trial." R.C. 2945.73(B). A defendant cannot raise a speedy trial issue for the first time on appeal. State v. Brown
(Dec. 19, 1999), Belmont App. No. 99BA13, unreported, 2 (citing a case from every appellate district except the first district). It appears that the reason Shauna Scott's speedy trial rights were not argued to be violated in the brief was because it was clear that her speedy trial rights had not been violated at that time. She was indicted on September 17, 1998 and served with the indictment four days later. The motion to dismiss was filed on April 28, 1999. Two hundred and seventy days had not yet elapsed. As such, any argument that Shauna Scott's speedy trial rights were violated was without merit.
In response to Lester Scott's argument that his speedy trial rights were violated, the state points out that pursuant to App.R. 12(A)(2), an appellate court may disregard an assignment of error if it fails to identify where in the record the error occurred. We reiterate that the appellate brief merely sets forth a general allegation that a trial was not held within two hundred and seventy days after the date of arrest. The brief fails to present any arguments regarding relevant dates, days passed, the sufficiency of continuances or which continuances are chargeable to whom. Moreover, in constructing our own table of dates and evaluating the rulings, we conclude that various continuances and motions tolled the speedy trial time and extended the "try by" date so that it had not been violated on April 28, 1999, the day the motion to dismiss was filed.[1]
Pursuant to R.C. 2945.72(E), the two hundred seventy day try by time period may be extended by a period of delay necessitated by motion, proceeding or action made or instituted by the accused. This time period may also be extended by the period of a continuance granted on the defendant's own motion or the period of a reasonable continuance granted other than upon the accused's own motion. R.C. 2945.72(H). The determination of whether a continuance is reasonable can be made by reviewing the reasons set forth in the journal entry. See State v. King
(1994), 70 Ohio St.3d 158, 162 (holding that where the court sua sponte
grants a continuance, the court must enter the continuance and the reasons therefor in a journal entry prior to the expiration of the speedy trial time).
Appellant was arrested on February 18, 1998. He filed his motion to dismiss on April 28, 1999, the day the trial was scheduled to begin. At that time, four hundred thirty four days had passed. This is facially over the two hundred seventy day period. However, we shall outline the various occurrences that extended this time period. The following list of days and descriptions are chronological examples of defense motions and actions, defense requests for continuances, sua sponte continuance with reasons set forth in a journal entry and continuances granted on the state's motion with reasons set forth in the journal entry: thirty days from the date Lester Scott filed a suppression motion until the date the hearing was originally scheduled to begin; five days when the court suasponte continued the suppression hearing and stated in a journal entry that the court was engaged in another trial; thirteen days when the state was granted a continuance and the journal entry demonstrated that an officer who would testify was away at training; twenty-one days the suppression hearing was continued on motion of the defense requiring the trial date to also be reset; seventy-one days when the state was granted a continuance in a journal entry which established that state witnesses would be unavailable for the next two months; one day for the suppression hearing; eight days when the defense asked that the suppression hearing be continued; seventy-three days between the time of the continued suppression hearing and the date that the defense filed the suppression brief that it desired to file (this time includes: forty-five days between the time of the continued suppression hearing at which the defense stated it would file a posthearing brief and the time the speedy trial date elapsed, and a twenty-two day extension granted to the defense to file a brief after it missed its deadline for the second time); twenty-nine days when the defense, on December 15, 1998, asked that the jury trial be rescheduled; thirteen days when the court sua sponte
continued the trial date due to the defense's filing of a supplemental suppression brief and the need to give the state time to respond; and at least thirty days after that period for the court to decide the finally fully briefed and argued suppression issue.
Other time periods could arguably have assisted in further extending the time period; however, the aforementioned are the most glaring occurrences that allowed extension. In conclusion, the original speedy trial try by date was November 15, 1998. Between that day and April 28, 1999 (which is both the date the trial was to take place and the date the defense filed its dismissal motion), approximately one hundred sixty-four days had elapsed. However, prior to expiration of the original speedy trial date, at least one hundred ninety-four days had been accumulated that extended the speedy trial time. Moreover, as can be seen supra, events occurring after November 15, 1998 further extended the speedy trial date. Accordingly, this argument is without merit.
WAITE, J., dissents; see dissenting opinion.
DeGENARO, J., concurs.
[1] We shall only evaluate the time period between the date of arrest and April 28, 1999 as that was the only time period at issue before the trial court. (See Motion to Dismiss and Supplement). We note that appellant failed to provide transcripts of the proceedings that concerned his speedy trial arguments.